## MOSSELLER v. UNITED STATES.

District Court, S. D. New York.

April 1, 1947.

Simone N. Gazan, of New York City, for libellant.

John F. X. McGohey, U. S. Atty., of New York City (Kirlan, Campbell, Hickox & Keating and Vernon Jones, all of New York City, of counsel), for respondent.

KENNEDY, District Judge.

Libellant, Mosseller, by his guardian has filed his libel in two counts to recover an indemnity for personal injuries sustained through the negligence of the respondent (Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq.; Jones Act, 46 U.S.C.A. § 688; Public Law 17, 50 U.S.C.A.Appendix, § 1291), and also to recover maintenance and cure.

On February 7, 1946, respondent's ship, the Sea Scorpion, was unloading cargo at

Batavia, Java. Shortly prior to 4:40 p. m. on that date Mosseller was acting as hatch tender at the No. 1 hatch. Japanese prisoners of war had been acting as stevedores; they had finished their work for the day and were engaged in covering the hatch.

The square of the No. 1 hatch on Sea Scorpion is about 20 feet wide and 25 feet long. The winches serving that hatch are just forward of its forward coaming, which rises about two and one-half feet from the deck. The controls for these winches are on a platform elevated from the deck, and so constructed that the after edge of this platform is practically flush with the forward hatch coaming. The ship was starboard side to the dock. The starboard (in-shore) winch control was being handled by one White, the port (off-shore) winch control by one Willis. The starboard boom was being used to hoist the sections of the hatch cover and drop them into place, the port boom being rigged over the port side.

On Sea Scorpion, the No. 1 hatch is covered by eight sections of steel pontoon hatch covers; each section is about 20 feet long (the width of the square of the hatch), four to five feet wide, and eight inches deep. In each corner of each cover section is a groove or slot, in which there is a bar. Hooks can be fitted into each groove, in such wise as to engage the bar. Each hook is spliced into a halyard about 15 feet in length, running to a ring. All 4 halyards are joined at this ring so as to form a bridle of four legs, and when the ring of the bridle is placed over the cargo hook the up and down fall serves to raise or lower each cover section more or less in a horizontal position.

Just prior to the accident the forward half of the No. 1 hatch had been completely covered. The last section to be placed was, of course, the most forward section. So far there is no dispute about the facts. Nor is there any dispute about the fact that Mosseller was flung into the hold because the up and down fall was taken up while one leg of the bridle was still secured to the hatch cover, at a time when he was standing on that very cover section. The dispute, such as there is, centers around three ques-

tions: (1) Did Mosseller, while he was standing on the cover section, signal either of the winchmen, or both to take up the fall, in ignorance of the fact that one halyard was still made fast? (2) Which of the halyards was then made fast? (3) Where, on the cover section was Mosseller standing and what was he doing just prior to the time that the fall was taken up?

I heard the testimony of Mosseller and of Willis. I was impelled to put the greatest reliance upon the accuracy and the believability of Mosseller's testimony. Willis did not, except vaguely, contradict Mosseller concerning the crucial fact: Whether the latter gave a signal to take up the fall. White's testimony, unfortunately, was in deposition form. However, even on the assumption that he would, in a courtroom, have given an impression of complete sincerity, it seeme to me that he was none too sure about the facts. And I base this conclusion upon the form of words he himself employed in his answers to certain crucial questions.

Evaluating the testimony in this way, and giving consideration to the physical facts, it is highly probable, and I find as a fact, that the accident happened in the following way.

One of the Japanese was standing on the deck near the port after corner of the forward cover section. He was having trouble disengaging the hook on the halyard. Mosseller was then on the starboard side of the hatch. He crossed over the hatch sections (all of which were already in place), got the Japanese out of the way, and bent down over the slot in which the hook was engaged. He squatted on the most forward section of the hatch cover, with his back to the winchmen. He had just succeeded in disengaging the hook, was rising from the position in which he was, and had commenced to cross over to the starboard side of the hatch. At this moment White applied the power on the up and down fall, without receiving any signal to do so from Mosseller. The port forward halyard was still engaged in its slot, either because it had never been freed, or because it had re-engaged itself, it makes no difference which. The hatch cover tipped up to port, and Mosseller

was precipitated into the hold on the starboard side.[1]

Mosseller never gave any signal to raise the cover section on which he was standing. Although both White and Willis asserted after the accident that he had, both were very vague on the point. White who was the more specific of the two, after some apparent haziness, said that Mosseller had signalled with his hands. But this could not be so: if White was looking at Mosseller and saw him give a hand signal to raise the fall, he must also have seen that Mosseller was standing on the hatch section to be raised and took up the fall anyway. And White's deposition contains practically an admission that he was not looking at the cover section when he started the winch. He could not have seen Mosseller, therefore he could not have seen him signal.

■ If I am right in all this, then the negligence of the respondent is clear. There was no signal, and White could and should have seen the still hooked halyard. And it also follows that Mosseller is not guilty of any degree of contributory negligence. For it can hardly be asserted that it was negligence in law for Mosseller to make an attempt to free the hook while standing on the cover section. Perhaps he could have done it from the deck. But if the hook had become fouled, I would suppose it a wholly natural thing for any seaman to attempt to clear it in the way Mosseller says he did. Beyond all that the testimony is abundantly clear that the winch was not to be started except on signal from Mosseller, and, as I have said, all the evidence indicates to me that he gave none. That being so, he had a right to be where he was, and to rely upon some measure of alertness and care on the part of White, who failed to exercise it.

■ Mosseller is now in the Marine Hospital at Staten Island. He has a compression fracture of the twelfth thoracic verte-bra, with paraplegia below that level. His spinal cord is completely severed. Of course, this means that he will never walk again except possibly with the aid of braces and crutches. Vital functions normal to any other human being he will never be able to perform except by the aid of what, at best, are makeshifts. The respondent called evidence at the trial concerning what is now being done for paraplegics, notably through a system instituted, or at least put into wide practice, by Dr. William G. Kuhn, Jr. I was strongly and favorably impressed with the skill that Dr. Kuhn has brought to bear on the problem, and the industry and ingenuity he has shown in attempting to reach, at least, a partial solution. But on this record I can reach no other conclusion except that Mosseller is completely disabled and .will be for life.

■ He was, at the time of the accident, earning $145 a month as an able seaman. His expectancy of life is 42.20 years. Using a three per cent discount rate (Porello v. United States, 2 Cir., 1946, 153 F.2d 605) it appears that an annuity of $1,740 a year can.be obtained by investing the principal sum of about $43,000.

Mosseller is at present in no physical pain, because he is completely paralyzed.[2] But for his past pain, and his physical impairment together I should think $15,000 in addition, would be fair compensation. He will have lost earnings, by the time of the entry of a decree, amounting to $2175, and this makes a total of $60,175.

Mosseller is, therefore, entitled to a decree against the respondent in the amount of $60,175 on the first count of the libel.

■ As long as maintenance and cure at a seaman's hospital is available to Mosseller, and he is receiving it, he must take it. The Bouker No. 2, 2 Cir., 1917, 241 F. 831. Perhaps some time a condition may arise when Mosseller may become entitled to a decree for maintenance and cure. But un-

---

[1] Both winchmen agree that the halyard which had caused the trouble was at the port forward corner; the ship's log says it was the port after halyard. Mosseller thought he was still on the port side of the cover section when it tipped; both winchmen were sure that he was in the center or on the starboard side. But the strong likelihood is that the facts are as I have set them forth above.

[2] He does suffer somewhat from the effect of constant use of a catheter, but I believe this has been remedied.

der present conditions he is not entitled to such a decree. Therefore, in computing present damages, I have entirely left out of consideration the fact that from the time of the accident Mosseller was entitled to his board and keep. I have done this because at present he is being given the equivalent, and presumably will continue to receive that equivalent, for an indefinite time. The same thing is now true of "cure." Under these circumstances I think it is right to dismiss the maintenance and cure count, without prejudice, because I cannot tell what the future may bring.[3]

 Libellant's proctor suggested somewhat sketchily at the trial, and even more sketchily in the briefs, that a present element of Mosseller's damage is the cost of extra nursing facilities, and of special food, which the Marine Hospital is unable to supply. I pay no attention to this, because I think that so long as a seaman is maintained at a hospital, or its facilities are available the owner's liability for maintenance and cure is at least suspended. In any event, even if I am wrong on that point, there was no clear showing at the trial which would support a finding of fact upon which such an award could be based.

Submit decree.

---

[3] I emphasize that I am deciding nothing either way on the question of maintenance and cure, except that there is no present liability.